UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CRISTINA WINSOR,

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff,

-against-

**Index No. 19-cv-06462 (AT)(JLC)**

THE CITY OF NEW YORK; NEW YORK CITY POLICE DEPARTMENT ("NYPD") OFFICER REGINA VASQUEZ, SHIELD NO. 31613; and NYPD OFFICER CHRISTOPHER MULVEY, SHIELD NO. 11319; individually and in their official capacities,

**ECF CASE**

Defendants.

---

Plaintiff, CRISTINA WINSOR, by counsel, GIDEON ORION OLIVER, as and for Plaintiff's Complaint against Defendants, hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff brings this action for compensatory damages, punitive damages, declaratory relief, and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, for violations of Plaintiff's civil rights, as secured by said statutes and the Constitution of the United States.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

3.      The Federal Declaratory Judgment Act, 28 USC §§ 2201 and 2202, authorizes this Court to grant Plaintiff the declaratory relief prayed for herein.

4.      This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4).

5.     Venue is proper pursuant to 28 U.S.C. §1391(b) in that Plaintiff's claims arose in the Southern District of New York.

**PARTIES**

6.     Plaintiff CRISTINA WINSOR is a Caucasian female.

7.     At all times relevant to this action, was a resident of New York State.

8.     THE CITY OF NEW YORK ("NYC" or "the City") is a municipal entity created and authorized under the laws of the State of New York, with general offices located at City Hall, New York, New York 10007.

9.     The City is authorized by law to maintain the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement, and the City is ultimately responsible for the NYPD and assumes the risks incidental to the maintenance of it and its employees.

10.     At all times relevant herein, Defendants NYPD OFFICERS REGINA VASQUEZ, SHIELD NO. 31613; and CHRISTOPHER MULVEY, SHIELD NO. 11319, were officers, employees, and agents of the NYPD who were personally involved in depriving Plaintiff of Plaintiff's rights, as set forth more fully below.

11.     At all times hereinafter mentioned the Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

12.     Each and all of the acts of the Defendants alleged herein were done by said Defendants while acting within the scope of their employment by the Defendant City.

13.     Each and all of the acts of the Defendants alleged herein were done by said Defendants while acting in furtherance of their employment by the Defendant City.

2

14.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

15.     Each individual Defendant is sued in her or his individual and official capacities.

## STATEMENT OF FACTS

### Some Relevant Background

16.     Beginning in around February of 2015, New York City-based Black Lives Matter activists, including NYC Shut it Down, organized "People's Monday" protest events to memorialize victims killed by police.

17.     Upon information and belief, between around February of 2015 and July of 2016, the NYPD engaged in extensive surveillance of Black Lives Matter activists, organizers, and events, including People's Monday protest events.

18.     Upon information and belief, as part of the NYPD's response to People's Monday protests, between around February of 2015 and July of 2016, the NYPD assigned details of uniformed and non-uniformed NYPD officers to police People's Monday protests.

19.     At all times relevant herein, the NYPD Legal Bureau was legal counsel for and represented the NYPD and its interest.

20.     As a matter of course, at all times relevant herein, although NYPD Legal Bureau attorneys were always available to be consulted on a case-by-case basis if necessary, NYPD Legal Bureau attorneys were not usually assigned to be and/or present for, or otherwise involved in, routine arrests or prosecutions.

21.     Upon information and belief, as part of the NYPD's response to People's Monday protests, NYPD policymakers determined that NYPD Legal Bureau attorneys would be present

at the NYPD precincts at which arrests related to People's Monday were processed in order to assist NYPD officers who had made arrests, or been assigned to process arrests, in determining whether to charge arrestees, and if so, what to charge them with, and/or how to describe the underlying conduct in charging documents, including summonses.

22.   Upon information and belief, as part of the NYPD's response to People's Monday protests, NYPD policymakers determined that people arrested in connection with certain Black Lives Matter protests, including People's Monday protests, would be charged with New York State Vehicle and Traffic Law ("VTL") § 1156(a).

23.   VTL § 1156(A) says that, "where sidewalks are provided and they may be used with safety it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway." *See* VTL § 1156(A).

24.   Upon information and belief, outside of the cases of summonses issued in connection with Black Lives Matter protests beginning in around 2015, NYPD officers almost never enforce VTL § 1156(A).

25.   At all times relevant herein, the Office of the District Attorney of New York County ("DANY") had a policy of not appearing to prosecute cases charged by NYPD summonses.

26.   This DANY policy of stepping aside from prosecuting summons cases had historically been followed at all times relevant herein, even when DANY Assistant District Attorneys were present in a ocurt part where summons cases are head on the same calendar as cases initiated by Desk Appearance Ticket or a criminal court complaint, where ADA's were actually present, handling all but the summons cases.

27.     At or after arraignment on a summons at all times relevant herein, the New York City Criminal Court typically would typically make an offer based on which the Defendant may dispose of the case at arraignment.

28.     Between at least 2004 and late 2015, the typical offer at arraignment from DANY on a perceived protest arrest case alleging a violation-level offense or offenses was an ACD, without any statement or admission from the Defendant.

29.     Between at least 2004 and late 2015, the typical offer at arraignment on a summons cases alleging a violation-level offense or offenses has been an ACD, without any statement or admission from the Defendant.

30.     In around late 2015, the NYPD Legal Bureau began attempting to appear and act as prosecutor in certain, primarily Black Lives Matter protest-related prosecutions charging certain offenses by summons.

31.     Upon information and belief, the attorneys who appeared and/or attempted to appear on behalf of the NYPD Legal Bureau in those cases were from the NYPD Legal Bureau's Police Action Litigation Section ("PALS").

32.     Upon information and belief, PALS was part of the NYPD Legal Bureau's Civil Matters Division, established in June of 2014, "responsible for advising [the] NYPD on policies and procedures to prevent civil litigation, aiding the Department in the defense of its employees through the course of pending cases, and taking necessary steps to prevail in a greater percentage of cases, with a focus on matters alleging intentional police misconduct."

33.     Upon information and belief, the main focus of PALS was developing and implementing proactive strategies in response to civil lawsuits brought against the NYPD.

34. Upon information and belief, at all times relevant herein PALS worked with the NYPD's Director, Civil Matters – Executive Agency Counsel, as well as attorneys from the Law Department, in defending the NYPD, and NYPD officers, in federal civil rights lawsuits, including such lawsuits related to arrests and other police actions taken in connection with policing protests.

35. Upon information and belief, in around late 2015, the New York City Law Department began arguing in some federal civil rights lawsuits arising from police actions taken in connection with policing protests, that probable cause, or at least arguable probable cause, to arrest, existed for violations of VTL 1156(a).

36. At around the same time, in around late 2015, NYPD Legal Bureau attorneys, and specifically, PALS attorneys, began attempting to prosecute summons cases arising from arrests made at primarily Black Lives Matter protests.

37. In response to attorneys' challenges to those practices, NYPD Deputy Commissioner of Legal Matters Lawrence Byrne reportedly said: "We're trying to put some teeth into issuing these summons" and the *New York Daily News* reported that "top brass" said that NYPD was seeking to prosecute the cases because" too many cases involving people they consider professional protesters [were being] dismissed in summons court, paving the way for a civil lawsuit and settlement with the city."

38. Significantly, the NYPD Legal Bureau attorneys would offer ACD dispositions only if the defendant would allocute to sufficient facts to establish that there was probable cause to arrest for the charged offense(s), under oath and on the record.

39. Such admissions would have insulated the NYPD from civil liability in connection with false arrest and other federal civil rights claims.

40.     Attorneys for protesters in whose cases the NYPD Legal Bureau sought to act as prosecutor challenged the NYPD Legal Bureau attorneys' authority to act as prosecutor in summons cases in late 2015 and early 2016.

41.     In around February of 2016, DANY entered into a Memorandum of Understanding with the NYPD (the "MOU") purporting to delegate DANY authority to prosecute certain cases charging violation-level offenses by summons and related appeals to the NYPD Legal Bureau.

42.     Upon information and belief, after February of 2016, purportedly under the authority of that MOU, NYPD Legal Bureau Prosecutions from the NYPD Legal Bureau's PALS prosecuted almost exclusively summons cases against Black Lives Matter protesters.

43.     The NYPD Legal Bureau PALS prosecutors' requirement, imposed in those cases, that a Defendant allocate  to facts sufficient to establish that there was probable cause to arrest for the charged offense(s), under oath and on the record, in order to receive an ACD offer, was a deviation from DANY's routine practices in connection with offering ACD's in violation-level protest cases, and the New York City Criminal Court's routine practice of offering ACD's as a matter of course in such cases, which requirement the NYPD Legal Bureau attorneys sought to impose primarily in connection with prosecutions arising from Black Lives Matter protests, and not in connection with prosecutions for the same offenses, arising outside of the Black Lives Matter protest context.

**The July 11, 2016 People's Monday Protest**

44.     Prior to July 11, 2016, People's Monday activists published plans for prospective participants to meet up and engage in a People's Monday protest on the evening of July 11, 2016.

7

45.     Plaintiff participated in the People's Monday protest during the evening of July 11, 2016.

46.     Third-party Babbie Dunnington participated in the same People's Monday protest on the evening of July 11, 2016.

47.     Ms. Dunnington brought her bicycle to that protest.

48.     Defendants Vasquez and Mulvey were part of a larger NYPD detail assigned to police that protest.

49.     Defendants Vasquez and Mulvey had, at the time, been NYPD officer-partners for around 12 years.

50.     Defendants Vasquez and Mulvey were both assigned to the Strategic Response Group ("SRG") 1.

51.     After reporting to their shift at the Strategic Response Group offices in Manhattan on the afternoon of July 11, 2016, Defendants Vasquez and Mulvey traveled to Randall's Island to participate in a larger NYPD detail.

52.     On Randall's Island, Defendants Vasquez and Mulvey participated in roll-call for a larger NYPD detail assigned to police the July 11, 2016 People's Monday protest.

53.     According to trial testimony from Defendant Mulvey, at that roll call on Randall's Island, NYPD Inspector Anthony Lombaro instructed officers in sum and substance that, if protesters marched in the roadway and refused police orders to get onto the sidewalk, New York Penal Law ("PL") § 240.20(6) and VTL § 1156(a) violations "would be the two summonses to write."

54.     At around 4:30PM, Defendants Vasquez and Mulvey were deployed to the vicinity of 106th Street and 1st Avenue as part of a NYPD detail assigned to police that People's Monday protest.

55.      Upon information and belief, Defendants Vasquez and Mulvey remained in the vicinity of 106th Street and 1st Avenue until around 8:00PM, standing by for further instructions.

56.     Upon information and belief, at around 8:00PM, NYPD supervisors ordered Defendants Vasquez and Mulvey to start following the protest, which was by then moving through the area.

57.     Upon information and belief, when Defendants Vasquez and Mulvey started following the protest, as the protesters walked along the sidewalk (in some cases spilling into the roadway), Defendants Vasquez and Mulvey, along with many other NYPD officers, walked in the roadway close to the sidewalk, directing protesters who stepped off the sidewalk to get back on the sidewalk.

58.     According to Defendant Vasquez's trial testimony on direct, over the course of the next hour, she, her partner, and other NYPD officers walked with the protesters roughly north and west, stopping traffic for them to cross the street when necessary, keeping cars away from them, and them away from cars, and "always walking alongside" them in a "long line" of police officers.

**116th Street between 6th and 5th Avenues**

59.     At just before around 9:00PM on July 11, 2016, Ms. Winsor arrived at the corner of 116th Street and 6th Avenue.

60.     At just before around 9:00PM on July 11, 2016, Ms. Winsor turned from the sidewalk on 6th Avenue onto the southern sidewalk of 116th Street, and continued walking east on that sidewalk.

61.     On 116th Street between 6th and 5th Avenues, vehicular traffic ran east and west.

62.     116th Street between 6th and 5th Avenues had two lanes for car parking on the north and south sides of the street.

63.     On 116th Street between 6th and 5th Avenues, there were four total lanes for vehicular traffic between those two lanes for car parking: two lanes for vehicular traffic running west to east to the north side of the roadway, separated from each other by a dotted white line; separated by a double yellow line from two lanes for vehicular traffic running east to west on the south side of the roadway, separated from each other by a dotted white line.

64.     A large, metal scaffolding extended east-to-west along the southern sidewalk of between around the location approximately opposite 45 116th Street at which Defendant Vasquez ultimately arrested Ms. Winsor.

65.     There was a gap between the large, metal scaffolding on the sidewalk and the sidewalk-side curb to its north, between the scaffolding and the southernmost parking lane in the 116th Street roadway.

66.     On 116th Street around opposite 45 116th Street, where Defendant Vasquez ultimately placed Ms. Winsor under arrest, the large, metal scaffolding impeded and/or prevented pedestrians who were walking on the roadway from passing freely onto the sidewalk, and pedestrians who were walking on the sidewalk from passing freely onto the roadway.

67.     Ms. Dunnington did not run into the 116th Street roadway.

68.     Ms. Dunnington did not block traffic in the 116th Street roadway near where she was arrested.

69.     According to Ms. Dunnington's trial testimony, she had not run into the street from the sidewalk, or anywhere else, before she was arrested.

70.     According to Ms. Dunnington's testimony during Ms. Winsor's criminal trial, in the few minutes before her arrest, she had been marching east in the roadway on 116th Street with her bicycle.

71.     According to Ms. Dunnington's trial testimony, in the two minutes prior to her arrest, an officer in a white shirt became "agitated because he wanted" Ms. Dunnington "to get on the sidewalk….immediately."

72.     According to Ms. Dunnington's trial testimony, she could not immediately get on the sidewalk at that time because she "had a bicycle, a bulky beach cruiser…[a]nd the sidewalk was very – there was scaffolding there, there was tons of people and [she] couldn't get through everyone to get on the sidewalk."

73.     According to Ms. Dunnington's trial testimony, she had a "kind of like back and forth" with the white-shirted NYPD supervisor where he ordered her "to get on the sidewalk immediately" but she "couldn't", after which she "got frustrated and … asked him, 'Don't you care about her safety?' and he said, 'No.'"

74.     According to Ms. Dunnington's trial testimony, that white-shirted officer then abruptly, physically arrested her.

75.     According to Ms. Dunnington's trial testimony, Defendant Mulvey did not physically arrest her at all.

76.     According to Ms. Dunnington's trial testimony, just a few seconds after the white-shirted officer physically arrested her, NYPD officers escorted her to the back of a police wagon that was in the middle of, and near the north side of, the roadway, around 7-12' away from the location of her arrest.

77.     On 116th Street between around its intersection with 6th Avenue around opposite 45 116th Street, where Defendant Vasquez ultimately placed Ms. Winsor under arrest, Ms. Winsor walked on the sidewalk, along the gap between the curb and the scaffolding – not in the roadway.

78.     Ms. Winsor heard no police orders to get on the sidewalk at the corner of 6th Avenue and 116th Street or as she walked from the corner of 6th Avenue, eastward on the116th Street sidewalk.

79.     As Ms. Winsor reached around the middle of the block, as she walked eastward along the part of the sidewalk between the metal scaffolding and the curb, Ms. Winsor heard the voice of her friend, Babbie Dunnington, saying the word "safety", which drew her attention to Ms. Dunnington.

80.     Ms. Winsor then saw Ms. Dunnington in the southern part of the roadway, nearest to the parking lane and curbline, next to a NYPD supervisor in a white shirt with whom Ms. Dunnington was having an "animated conversation."

81.     Ms. Winsor then saw the white-shirted NYPD supervisor "grab her…in a very abrupt manner."

82.     Ms. Winsor then stepped off the sidewalk on 116th Street in order to observe what the police were doing to her friend, Ms. Dunnington.

83.     As Ms. Winsor explained during her trial testimony: "[She] saw that [Ms. Dunnington] looked scared and I wanted to see what the police were doing with my friend."

84.     After Ms. Winsor stepped off the sidewalk, she followed police who quickly transported Ms. Dunnington in handcuffs to the back of a NYPD wagon that was parked in around the middle, toward the north side, of the roadway.

85.     The NYPD wagon that was parked around the middle, toward the north side, of the roadway was around 10 feet away from the location where the white-shirted NYPD supervisor first arrested Ms. Dunnington.

86.     Around 15 or fewer seconds elapsed between the moment Ms. Winsor left the sidewalk and the moment she arrived behind the NYPD wagon.

87.     During that around 15 or fewer seconds, Ms. Winsor followed and observed NYPD officers who had Ms. Dunnington in custody and were rapidly moving her to the back of the NYPD wagon.

88.     Within a few seconds after Ms. Winsor arrived behind the NYPD wagon, a female NYPD officer approached Ms. Winsor from behind and physically arrested her.

89.     Defendant Vasquez did not observe Ms. Winsor run into the roadway.

90.     Ms. Winsor did not run into the roadway with numerous people.

91.     Ms. Winsor did not run into the roadway with 3 or more people.

92.     Ms. Winsor did not touch or try to touch Defendant Vasquez.

93.     Ms. Winsor did not touch or try to touch Defendant Mulvey.

94.     Ms. Winsor did not touch or try to touch Ms. Dunnington.

95.     Ms. Winsor did not block eastbound traffic in the 116th Street roadway near where she was arrested.

96.     At no time after Ms. Winsor entered the roadway after Ms. Dunnington was placed under arrest on 116th Street did Defendants Vasquez, Mulvey, or any other NYPD officer order Ms. Winsor to get back or get back on the sidewalk.

97.     At no time after Ms. Winsor entered the roadway after Ms. Dunnington was placed under arrest on 116th Street did Defendants Vasquez, Mulvey, or any other NYPD officer order Ms. Winsor to disperse.

98.     As seen below, videos depicting Ms. Dunnington's and Ms. Winsor's arrests entered into evidence as part of the defense case in Ms. Winsor's criminal trial substantially confirmed Ms. Dunnington's and Ms. Winsor's sworn testimony about the events leading up to them, and substantially disproved Defendants Vasquez's and Mulvey's false evidence.

**Plaintiff's Arrest Processing and Pre-Trial Prosection**

99.     After their arrests at around 9:00PM on July 11, 2016, Ms. Winsor and Ms. Dunnington were both loaded into the same NYPD wagon, and subsequently transported to a NYPD Precinct.

100.     Defendant Mulvey wrote the following in his memo book regarding his observations of Ms. Dunnington's alleged conduct: "OP 45 W1 116 I observed Dunnington, Babbie … with numerous other people in the street. After repeated warnings to return to the sidewal, she refused and remained in the roadway."

101.     Defendant Vasquez wrote the following in her memo book regarding her observations of Ms. Winsor's alleged conduct:

> DEFT refused to return to the sidewalk after being ordered several times I observed Deft being told to leave the street and return to the sidewalk repeatedly. As an arrest was being made. [ILLEGIBLE] deft. away from the arrest being made I asked her to move to the sidewalk. I told her she would be arrested if she did not she relied that she did not care and that she would not leave as she shoved her body into mine.

14

102.    Upon information and belief, at that precinct, Defendants provided false information in the form of memo book entries regarding their observations of and interactions with Plaintiff and Ms. Dunnington to a non-party NYPD Legal Bureau Attorney.

103.    Upon information and belief, at that precinct, Defendants provided false information in the form of verbal statements regarding their observations of and interactions with Plaintiff and Ms. Dunnington to a non-party NYPD Legal Bureau Attorney.

104.    Upon information and belief, at that precinct, Defendants provided false information in the form of false allegations contained in sworn summonses regarding their observations of and interactions with Plaintiff and Ms. Dunnington to a non-party NYPD Legal Bureau Attorney.

105.    As a result, Ms. Winsor was held until after around 10:30PM before being released with two summonses sworn to by Defendant Vasquez, charging Ms. Winsor with offenses to be tried in New York City Criminal Court.

106.    Summons No. 4431970302, later assigned Docket No. 2016SN039363, charged Ms. Winsor with violating New York State Penal Law ("PL") § 240.20(6) – Disorderly Conduct - based on the following allegations regarding Defendant Vasquez's alleged observations at July 11, 2016, at 8:58PM, opposite 45 West 116th Street: "At tpo I observed deft. with numerous persons run into street. After repeated warnings to return onto the sidewalk, deft did refuse and remained in the roadway."

107.    A person is guilty of violating PL § 240.20(6) and committing Disorderly Conduct when, "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof. . . [the person] congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." *See* PL § 240.20(6).

108.    Additionally, Summons No. 4431970316, later assigned Docket No. 2016SN039443, charged Ms. Winsor with violating VTL § 1156(a) - Pedestrians on Roadways - based on the following allegations regarding Defendant Vasquez's alleged observations of Ms. Winsor at July 11, 2016, at 8:58PM, opposite 45 West 116th Street: "At tpo I observed Deft in roadway along an accessable [sic] [sidewalk. I ordered defendant to return to the sidewalk. Defendant did refuse and remained in the roadway."

109.    Upon information and belief, at around the same time Defendant Vasquez released Ms. Winsor with those two summonses, Defendant Mulvey released Ms. Dunnington with two summonses alleging the same charges and the same substantive underlying conduct against Ms. Dunnington.

110.    The summonses Defendant Mulvey swore out against Ms. Dunnington are worded exactly the same as the summonses Defendant Vasquez swore out against Ms. Winsor, down to the mis-spelled word "accessable".

111.    Upon information and belief, Defendants Vasquez and Mulvey each consulted with the other as they filled out identically-worded summonses charging Ms. Winsor and Ms. Dunnington with violating PL § 240.20(6) and VTL § 1156(a).

112.    When the summons cases were first calendared to be heard on the September 22, 2016 return date in the New York City Criminal Court – SAP2 Part at One Centre Street, the NYPD Legal Bureau attempted to appear and act as prosecutor in the case, over the objection of Ms. Winsor's criminal defense counsel.

113.    Upon information and belief, beginning at that first appearance in September of 2016, and continuing throughout the criminal proceedings until the trial in September of 2017, the NYPD Legal Bureau attorney's only plea offer to Ms. Winsor was an Adjournment in

Contemplation of Dismissal ("ACD") pursuant to New York Criminal Procedure Law ("CPL") § 170.55 *to be offered only if* Ms. Winsor would allocute under oath to having committed the underlying conduct alleged in the summonses.

114.    At Ms. Winsor's arraignment on or about September 22, 2016, the New York City Criminal Court released her on his own recognizance pursuant to New York State Criminal Procedure Law ("CPL") § 510.40 (or "ROR"), requiring Ms. Wisnor to return until the cases were resolved.

115.    During the pendency of the criminal court cases, Ms. Winsor was required to remain at all times subject to and amenable to the processes, orders, and mandates of the New York City Criminal Court.

116.    In around November of 2016, through counsel, Ms. Winsor filed a Summons and Notice of Petition, Verified Petition and Complaint dated November 3, 2016, in *Arminta Jeffryes and Cristina Winsor v. Cyrus R. Vance, et al.,* Supreme Court – New York County Index No. 101836-16, seeking, *inter alia*, a judicial determination that DANY's purported delegation of prosecutorial authority to the NYPD was unlawful; and that the NYPD had a conflict of interest.

117.    Subsequently, through counsel, Ms. Winsor filed applications in each of the two separate pending summons dockets with the New York City Criminal Court, and served a copy on counsel for the NYPD Legal Bureau (acting as prosecutor in the case), seeking dismissal of the charges in the summonses on facial insufficiency grounds; or to preclude the NYPD Legal Bureau from prosecuting the case on the ground that (a) there was an inescapable conflict of interest; (b) the delegation of authority to the NYPD was not authorized; and/or (c) such prosecution would violate Equal Protection principles.

118.    In support of the parts of those applications seeking to preclude the NYPD Legal Bureau from acting as prosecutor, Ms. Winsor submitted, and relied on, the opening papers in the *Jeffryes v. Vance* civil litigation that had been filed as of that date.

119.    On January 27, 2017, Hon Laurie Peterson issued orders dismissing both summonses against Ms. Winsor for facial insufficiency and staying sealing for 30 days.

120.    On February 7, 2017, the NYPD served and filed a superseding accusatory instrument under Docket No. 2016SN039363, adding specific factual allegations to Defendant Vasquez's narrative in apparent attempts to address the deficiencies in the summonses as initially pleaded pointed out by Ms. Winsor's criminal defense counsel in the papers supporting the successful applications to dismiss the summonses for facial insufficiency.

121.    That superseding accusatory instrument purported to re-charge Ms. Winsor with the same two offenses, violating PL § 240.20(6) and VTL § 1156(a), based on the following allegations sworn to by Defendant Vasquez on February 7, 2017 regarding her alleged observations at July 11, 2016, at 8:58PM, opposite 45 West 116th Street:

> Deponent states that at the above mentioned date, time and location of occurrence deponent observed defendant, Cristina Winsor, run into the street with at least 3 or more persons. Deponent further states that deponent was wearing a police uniform with a designated police badge and deponent ordered the defendant and the others numerous times to disperse and to return to the sidewalk and that the defendant refused to go back on the sidewalk. Deponent further states that the defendant's actions caused public inconvenience, annoyance or alarm in that the defendant's refusal to move caused traffic to be blocked on the eastbound lanes of West 116th Street.

> Deponent further states that on the above date, time and police of occurrence while defendant was running into the street and refusing to disperse, deponent observed a sidewalk adjacent to the roadway and said sidewalk was free of any defect or issue which would have prevented the defendant from using said sidewalk safely and that defendant refused to use the available public sidewalk when ordered to do so.

122.    On February 24, 2018, the NYPD served and filed a written response to Ms. Winsor's already-successful motions for dismissals, asking, among other things, that the Court deem the February 7, 2018 accusatory instrument a superseding information.

123.    Over Ms. Winsor's opposition, in a March 1, 2017 written decision, Hon. Joanne B. Watters denied Ms. Winsor's applications to preclude the NYPD from acting as prosecutor and deemed the instrument filed by the NYPD on February 7, 2017 a superseding information.

124.    After the *Jeffryes v. Vance* civil proceeding was filed  in late 2016, DANY and the NYPD moved to dismiss the proceeding, including for purported failure to state a claim based on which relief could be granted because, *inter alia*, DANY and the NYPD contended that the delegation was lawful and the NYPD had no conflict of interest.

125.    At a March 27, 2017 pre-trial appearance in Ms. Winsor's criminal cases arising from the July 11, 2016 summonses, Hon. Stephen Antignani determined to wait for the decision on that application before proceeding to trial with the NYPD Legal Bureau attorney acting as prosecutor.

126.    In May of 2017, Ms. Winsor moved, through counsel, to dismiss the superseding information for facial insufficiency.

127.    In June of 2017, the NYPD Legal Bureau opposed the motion to dismiss, and Ms. Winsor filed reply papers through counsel.

128.    The New York City Criminal Court subsequently denied Ms. Winsor's motion to dismiss the superseding information for facial insufficiency and the cases were calendared for trial on August 1, 2017.

129.    Prior to August 1, 2017, the New York City Criminal Court adjourned the cases to September 26, 2017 for trial.

130.    On September 20, 2017, the New York State Supreme Court denied DANY's and the NYPD's motions to dismiss the *Jeffryes v. Vance* case. *See* Matter of Jeffryes v. Vance, 58 Misc 3d 185 (Sup Ct, NY County 2017) (Billings, J.).

131.    *Inter alia*, the Court held that the Petitioners had stated valid Due Process and conflict of interest-based claims, as well as valid legal challenges to the purported delegation of prosecutorial authority from DANY to the NYPD, based on which relief could ultimately be granted, in denying DANY's and NYPD's motions to dismiss.

132.    On or about September 25, 2017, through counsel, Ms. Winsor filed a supplemental application to disqualify the NYPD Legal Bureau from prosecuting the cases, or seeking pre-trial discovery regarding the justifications for and the legality of the delegation, and on Defendants' Equal Protection-based challenges to the prosecutions.

133.    On September 26, 2017, the New York City Criminal Court (Hon. Steven Antignani) denied Ms. Winsor's supplemental application.

134.    All told, between September of 2016 and September of 2017, Plaintiff was required to return to New York City Criminal Court approximately 11 times in order to resolve the charges against her before she was fully acquitted after a bench trial.

135.    Throughout that time period, the NYPD Legal Bureau prosecutors would only offer ACD dispositions if Ms. Winsor would allocute to the factual allegations underlying each of the summonses.

136.    On September 26, 2017, Hon. Antignani commenced and presided over the bench trial against Ms. Winsor.

137.    The bench trial took place throughout September 26, 2017 and September 27, 2017.

20

138.    On October 2, 2017, Hon. Antignani found Ms. Winsor NOT GUILTY on all counts and dismissed both charges against Ms. Winsor.

**On Defendants Vasquez's and Mulvey's Trial Testimony**

139.    At trial, the NYPD prosecutor's case against Ms. Winsor consisted only of sworn testimony given on September 26, 2017 by Defendants Vasquez and Mulvey, primarily regarding their alleged observations of and conduct toward Ms. Winsor and Ms. Dunnington at around the times of their arrests.

140.    When Defendants Vasquez and Mulvey testified against Ms. Winsor regarding their alleged observations of and conduct toward Ms. Winsor and Ms. Dunnington at around the times of their arrests, they had not seen the videos of Ms. Dunnington's and Ms. Winsor's arrests that were subsequently introduced into evidence as part of the defense case.

141.    Neither Defendant Vasquez nor Defendant Mulvey acknowledged that there was any metal scaffolding on the sidewalk on 116th Street around opposite 45 116th Street.

142.    Both Defendants Vasquez and Mulvey testified in sum and substance that the southern sidewalk on 116th Street around opposite 45 116th Street was defect- and obstruction-free.

143.    Both Defendants Vasquez and Mulvey testified in sum and substance that people were able to move more or less freely from the sidewalk to the street and from the street onto the sidewalk around opposite 45 116th Street.

144.    According to Defendant Mulvey's trial testimony on direct, as he stood on southeast corner of  116th Street and 6th Avenue, he saw protesters turn from 6th Avenue right (eastbound) onto the roadway of 116th Street, so he stood there "in the first lane of traffic, instructing every to remain on the sidewalk."

145.   According to Defendant Mulvey's trial testimony, at that time, Defendant Vasquez was "slightly behind him" also giving instructions that people should remain on the sidewalk.

146.   According to Defendant Mulvey's trial testimony, he noticed Ms. Dunnington at that time walking a bicycle and directed her to get back on the sidewalk.

147.   According to Defendant Mulvey's trial testimony, after directing Ms. Dunnington, he then first saw Ms. Winsor at that corner as she turned from 6th Avenue onto 116th Street, walking in the roadway, at which point he looked Ms. Winsor in the face and advised her at least three times to return to the sidewalk, but she continued walking in the street.

148.   According to Defendant Mulvey's trial testimony, he stood at that corner for "quite some time as the group turned."

149.   According to Defendant Mulvey's trial testimony, he eventually left the corner and walked eastbound with Defendant Vasquez walking slightly behind him (to his west).

150.   According to Defendant Mulvey's trial testimony, at around that time, he noticed Ms. Dunnington walking a bicycle "back and forth, back and forth" on 116th Street and repeatedly instructed her to get on the sidewalk.

151.   According to Defendant Mulvey's trial testimony, Defendant Mulvey repeatedly denied having seen Ms. Dunnington run into the street; he testified: "No. … Ms. Dunnington was always in the street."

152.   According to Defendant Mulvey's trial testimony, he and Defednant Vasquez were "following behind" Ms. Dunnington walking eastward on 116th Street until "at some point mid-block she went into the left-most [north] travel lane" as a result of which "all of the traffic… would have had to slow down" so Defendant Mulvey arrested Ms. Dunnington.

153.    According to Defendant Mulvey's trial testimony, no other officer initiated Ms.

Dunnington's arrest.

154.    According to Defendant Mulvey's trial testimony, there were no other police

officers talking with Ms. Dunnington just before or during the time Defendant Mulvey arrested

Ms. Dunnington.

155.    According to Defendant Mulvey's trial testimony, Defendant Mulvey himself

decided to arrest Ms. Dunnington.

156.    According to Defendant Mulvey's trial testimony, he was not ordered to arrest

Ms. Dunnington.

157.    According to Defendant Mulvey's trial testimony, he did not recall any white-

shirted NYPD supervisors present when he arrested Ms. Dunnington.

158.    According to Defendant Mulvey's trial testimony, he was in sum and substance

the only person to arrest Ms. Dunnington.

159.    According to Defendant Mulvey's trial testimony, as he was arresting Ms.

Dunnington, Ms. Winsor "came up to [him] and was interfering with his] ability to do so" by

"yelling at [him and…] at Ms. Dunnington" and then actually "grabbing Ms. Dunnington" as he

was trying to put on flexcuffs.

160.    Defendant Mulvey testified that, as he was controlling Ms. Dunnington, his "right

hand was going from [his] flex cuffs to put them on her, [which] took some time" during which

"Ms. Winsor was approaching."

161.    According to Defendant Mulvey's trial testimony, Ms. Winsor "delayed the

process" of his arresting Ms. Dunnington for at least 30 whole seconds by "distract[ing]" him

and "touching" Ms. Dunnington.

162.    According to Defendant Mulvey's trial testimony, he saw his partner "place[] a hand on" Ms. Winsor and tell her "numerous" – meaning "at least five" – "times to get back onto the sidewalk and not to interfere."

163.    According to Defendant Mulvey's trial testimony, he observed Ms. Winsor "bump into" Defendant Vasquez "with [her] shoulder."

164.    According to Defendant Mulvey's trial testimony, he saw his partner, Defendant Vasquez, arrest Ms. Winsor in the roadway on the south side of 116th Street.

165.    According to Defendant Mulvey, he watched Defendant Vasquez arrest Ms. Winsor "right next to" him while he had Ms. Dunnington under arrest between the eastbound lanes on the south side of the roadway.

166.    According to Defendant Mulvey's trial testimony, the "police action" in the eastbound travel lane shut down traffic for "at least five minutes" because "[n]o one was able to travel eastbound."

167.    According to Defendant Mulvey's trial testimony, he and Defendant Vasquez then "crossed over the double yellow line to the north side of the street into the north travel lane, awaiting a prisoner wagon."

168.    According to Defendant Mulvey's trial testimony, Inspector Lombardo then called for a prisoner wagon over the radio.

169.    According to Defendant Vasquez's trial testimony, she first saw Ms. Winsor at the corner of 6th Avenue and 11th Street, around 10 minutes before she was arrested, where she claimed to have personally ordered Ms. Winsor "more than three" times to "please get back on the sidewalk."

170.     According to Defendant Vasquez's trial testimony, she also heard Defendant Mulvey ask Ms. Winsor to go back to the sidewalk at that corner repeatedly, while she was standing around two arms' lengths' ahead (toward the east) of him.

171.     According to Defendant Vasquez's trial testimony, as she was walking east on 116th Street past 6th Avenue, vehicular traffic was driving past them without obstruction.

172.     According to Defendant Vasquez's trial testimony, she was walking to the east of Defendant Mulvey, eastward on 116th Street, when an interaction she said she saw Defendant Mulvey having with a woman with a bicycle drew her attention.

173.     According to Defendant Vasquez's trial testimony, at that time, Defendant Mulvey was directing the woman with the bicycle , saying "you must get back… on the sidewalk … if you're going to be part of this protest," but she was "not complying at all" and Defendant Mulvey "ha[d]to place her under arrest."

174.     According to Defendant Vasquez's trial testimony, she stopped walking east on 116th Street then she saw Defendant Mulvey decide to initiate, and intiate, Ms. Dunnington's arrest.

175.     According to Defendant Vasquez's trial testimony, she had a clear view of and memory of Ms. Dunnington's arrest.

176.     According to Defendant Vasquez's trial testimony, only Defendant Mulvey was personally involved in Ms. Dunnington's arrest.

177.     According to Defendant Vasquez's trial testimony, she actually observed Defendant Mulvey place Ms. Dunnington in handcuffs.

178.     According to Defendant Vasquez's trial testimony, there was no white-shirted officer within five feet of Ms. Dunnington's arrest – "they showed up afterwards."

179.    Defendant Vasquez testified: "I don't remember any white shirts on Ms. Dunnington. I remember white shirts in the area, but not hands on her. There was an arrest that Officer Mulvey decided to make."

180.    According to Defendant Vasquez's trial testimony, as Defendant Mulvey began placing the woman with the bicycle under arrest, Defendant Vasquez turned her back to the arrest as it was being made "to create … protection around the officer and the person being arrested" in a kind of "protective dome."

181.    According to Defendant Vasquez's trial testimony, as Defendant Mulvey was arresting Ms. Dunnington, and Defendant Vasquez was forming a "protective dome", Ms. Winsor was "right…in front of" Defendant Vasquez.

182.    According to Defendant Vasquez's trial testimony, at that time, Defendant Vasquez was facing to the north (with her back to the southern sidewalk) and Defendant Mulvey was to her west in the roadway.

183.    On direct examination, Defendant Vasquez testified that she did not see how Ms. Winsor entered the roadway at all.

184.    On direct examination, Defendant Vasquez testified that she did not see Ms. Winsor run into the street at all.

185.    On cross-examination, Defendant Vasquez said that she saw Ms. Winsor "run into the street several times" from the southern sidewalk in the "[a]pproximately a minute, two minutes" that were "[r]ight prior to [Ms. Winsor's] arrest" – while "Ms. Dunnington [was] being arrested."

186.    According to Defendant Vasquez's trial testimony, as Defendant Mulvey was arresting Ms. Dunnington, Ms. Winsor repeatedly tried to "push through" Defendant Vasquez

from the north to get to Ms. Dunnington, as Defendant Vasquez repeatedly told Ms. Winsor "to

go back on the sidewalk."

187.     According to Defendant Vasquez's trial testimony, it took around three minutes

for Defendant Mulvey to arrest Ms. Dunnington.

188.     Defendant Vasquez gave detailed and repeated testimony about a course of

conduct she said that Ms. Winsor engaged in over the course of those around three minutes

minutes that involved Ms. Winsor's repeatedly pushing or shoving Defendant Vasquez and

Defendant Vasquez's repeatedly ordering Ms. Winsor to step back or get on the sidewalk.

189.     For example, Defendant Vasquez testified that Ms. Winsor shoved her almost

continuously for around 20 seconds as Defendant Vasquez gave Ms. Winsor verbal directions to

get back and the like.

190.     Defendant Vasquez testified that Ms. Winsor repeatedly pushed or shoved her on

direct examination between five and ten separate times.

191.     Defendant Vasquez further testified that Ms. Winsor repeatedly pushed or shoved

her many more times throughout the rest of her examination.

192.     For example, Defendant Vasquez described that Ms. Winsor had "shoved [her] at

least three times."

193.     For example, Defendant Vasquez testified: "She shoved past me with her arms"

and "She kept shoving me to get to Ms. Dunnington while she was being arrested."

194.     Defendant Vasquez testified that Ms. Winsor "pushed through with her left hand

and then just went forward and put her hands onto" Ms. Dunnington, such that "[s]he was

passing over" Defendant Mulvey's shoulder as he was arresting Ms. Dunnington.

195.    According to Defendant Vasquez's trial testimony, at the location she arrested Ms. Winsor, she was 100% there was no obstruction on the sidewalk that would have prevented her from getting on or off the sidewalk.

196.    According to Defendant Vasquez's trial testimony, at the location she arrested Ms. Winsor, there were no fences or barriers or scaffolding whatsoever along the sidewalk, and she had a clear memory of that fact.

197.    Defendant Vasquez testified that she was 100% sure that she did not load Ms. Winsor into a NYPD wagon in around the middle of the street.

198.    Defendant Vasquez testified that she did not remember seeing a NYPD wagon in the middle of the street when she arrested Ms. Winsor.

199.    According to Defendant Vasquez's trial testimony, Defendant Vasquez decided to arrest Ms. Winsor because she was trying to "de-arrest" or "un-arrest" Ms. Winsor.

**The Video Evidence**

200.    As part of the defense case, in addition to Ms. Winsor's and Ms. Dunnington's testimony, the defense introduced two videos depicting the events leading up to and including Ms. Dunnington's and Ms. Winsor's arrests.

201.    *Inter alia*, the video evidence showed Ms. Dunnington walking eastbound among a group of protesters and NYPD officers in the southernmost traffic lane of the 116th Street roadway.

202.    *Inter alia*, the video evidence showed NYPD officers and vehicles at that location themselves blocking vehicular traffic in the southern part of the roadway.

203.    *Inter alia*, the video evidence showed Ms. Dunnington walking next to and speaking with a white-shirted NYPD supervisor, who can then be seen physically grabbing her and placing under arrest.

204.    *Inter alia*, the video evidence showed that Defendant Mulvey did not arrest Ms. Dunnington, as he had described in detail.

205.    *Inter alia*, the video evidence then showed Ms. Winsor entering the roadway from the direction of the south sidewalk.

206.    *Inter alia*, the video evidence showed that Defendant Vasquez was "nowhere near" Ms. Winsor when Ms. Winsor entered the roadway.

207.    *Inter alia*, the video evidence showed large, metal scaffolding along the northern edge of the south sidewalk at around opposite 45 116th Street.

208.    *Inter alia*, the video evidence showed a NYPD wagon in around the middle, toward the north side, of the roadway when Ms. Dunnington was placed under arrest.

209.    *Inter alia*, the video evidence showed NYPD officers moving Ms. Dunnington toward the north side of the roadway and the back of that NYPD wagon over the course of the next around at most 15 seconds.

210.    *Inter alia*, the video evidence showed Ms. Winsor during that time period in the roadway moving more along with the officers moving Ms. Dunnington, more slowly than those officers.

211.    *Inter alia*, the video evidence showed that Ms. Winsor did not approach or push or attempt to approach or push Defendant Vasquez at all while Ms. Dunnington was being placed under arrest.

29

212.    *Inter alia*, the video evidence showed Ms. Winsor move behind the NYPD wagon just after the officers moving Ms. Dunnington had moved her behind the NYPD wagon.

213.    *Inter alia*, the video evidence showed Defendant Vasquez, at that point, approaching the back of the NYPD wagon (and Ms. Winsor), apparently for the first time.

214.    *Inter alia*, the video evidence disproved Defendant Vasquez's testimony about her observations regarding Ms. Dunnington's arrest as well as her testimony about Ms. Winsor's allegedly pushing her and attempting to touch or interfere with Ms. Dunnington's arrest.

### Trial Court Comments on Defendants' Credibility and "NOT GUILTY" Verdict

215.    After the close of all of the evidence, the Court expressed to both defense counsel and the NYPD Legal Bureau prosecutor the Court's concerns that the trial testimony given by Defendants Vasquez and Mulvey was "the opposite of what we saw on the video."

216.    For example, during defense counsel's summations, the Court asked defense counsel:

> I want to ask you, when you say omitted are you saying that the witnesses called by the Police Department omitted it or they said actually something that was opposite of what we saw on the video?...What I'm asking is didn't the witnesses in fact say there was no scaffolding on this street and then the video showed ther was. Didn't the witnesses say that – the second witness say that he actually made the arrest of Ms. Dunnington, was the only one to stop her and there was no white shirt around, when in fact the video says differently. Isn't it true that the witness said that he was the one who went up to speak to her, no one else, when the video shows that was not true. …[O]r that didn't they say there was no van in the middle of the street when the video shows there was a van in the middle of the street.

217.    By way of additional example, at the outset of the NYPD Legal Bureau prosecutor's summation, the Court stated to the NYPD Legal Bureau prosecutor:

> "[Y]our officers gave me a version of events in which they described in great detail certain aspects of this whole incident, that on the video…that is totally different from what your officers, who on first blush came across quite credibly, what they told me happened.

And there are a number of those things, including both of them telling me there was no scaffolding on the street, for whatever it'ss worth. The fact that where…they testified both of them to me that there was no white shirt around ….but for the fact that the person in the white shirt actually was the one who placed Ms. Dunnington under arrest.

Your witness under oath came into this courtroom and told me that he was the one who approached Ms. Dunnington. He was the one who told her to get back on the sidewalk. He was the one who first started to put her in handcuffs. He was the one who did that.

Then … Officer Vasquez said…that at the time … Ms. Dunnington was being placed under arrest, before she was ever brought to the van, that she formed a permiter around where her partner was making an arrest and that this defendant pushed her maybe three or four times and then she placed this defendant under arrest.

On that video that I saw Officer Vasquez is nowhere near this defendant when she entered the street. I did see Officer Vasquez coming when it looked like – on that video when it looked as though Ms. Winsor was on the other side of the van….

218.    When the NYPD Legal Bureau prosecutor admitted that a white-shirted NYPD officer, not Defendant Mulvey, had placed Ms. Dunnington under arrest, arguing "clearly the superior officer in that situation hands them over to the respective officers," the Court said:

That's fine, but why did your officer not say that? …Your officer, who I have to rely on to convict this defendant, told me otherwise under oath. Why? That's what I'm asking you. What can be the basis other than trying to sort of keep out of this case, cause it's only a summons, a person who wears a white shirt. That's what you have to explain to me. …The believability of your witnesses is the crux of this case. That is the crux of this case, particularly as it relates to the VTL charge.

219.    When the NYPD Legal Bureau prosecutor attempted to argue that ther was not scaffolding "on each and every building", the Court said:

Your officer said there was zero scaffolding. Your officers did not say oh maybe there was some, they said noe existed. And now I don't know – I need a reason. I'm asking for something, a reasonable explanation as to why they would have said there was none, as opposed to saying I don't remember. …They wanted me to believe that ther was no scaffolding because that is what they testified to.

220.     When the NYPD Legal Bureau prosecutor admitted he could not give a reason,

the Court asked: "Could it be they didn't know a video existed?"

221.     When the NYPD Legal Bureau prosecutor attempted to argue that the officers

"didn't necessarily remember all the details", the Court said:

> Then they say I don't remember. That's my point. They need to say at
> moments I don't remember if there was scaffolding. I don't remember where the
> defendant was. I don't remember. Those words are quite – they're okay. It's not
> what they did. They said they remembered explicitly. In fact Officer Vasquez said
> and I kept turning around and I kept seeing Ms. Winsor go into the street and
> being told to get on the sidewalk. The second officer…in fact said that he
> believed Officer Vasquez was behind him, so she wouldn't have to turn around.
> Her testimony was she was – that's a minor detail, but that's what Officer
> Vasquez wanted me to believe, that she kept turning around and seeing Ms.
> Winsor going into the street. Maybe she did, but her partner said she was – she
> was behind him, not in front of her. …
>
> They didn't' say I don't remember. They told me words. They gave me
> what they said actually happened. They didn't say I don't remember.

222.     When the NYPD Legal Bureau prosecutor attempted to argue that whether there

were a NYPD wagon in the middle of the roadway when Ms. Dunnington and Ms. Winsor was

arrested was a "minor detail", the Court said:

> No, because how I took it was that your officers were afraid that I they
> indicated that there were police vans operating along that part of the road, then it
> took away your argument that she was obstructing traffic. That's why suddenly
> when I see the van in the thing I really see that's sort of the issue. Your witnesses
> say yeah, there was no van, in fact there were no police cars, because then the
> argument that she was impeding traffic, you lose it because it was the police cars
> that were impeding traffic, not their behavior of walking in the street even if she
> was as it relates to the disorderly. So that's why – you can say it's meaningless,
> but it's not because it takes that argument away from you.

223.     On October 2, 2017, the Court found Plaintiff "NOT GUILTY" of both charges.

**The Alleged NYPD "Investigation" (Or Lack Thereof)**

224.    Upon information and belief, the NYPD Legal Bureau prosecutor who was conducting the trial provided reports to the NYPD Legal Bureau, including the NYPD Deputy Commissioner of Legal Matters, during the trial in September, regarding the progress of the trial, and events in the trial.

225.    According to a report in the October 4, 2017 *New York Law Journal* by Andrew Denney ("NYPD Investigating Officers' Alleged Misstatements in Court"), the NYPD Deputy Commissioner of Legal Matters publicly stated during a panel discussion at the New York City Bar Association "that centered around the issue of police testimony" that the NYPD was "conducting an internal investigation and has also requested that the Manhattan DA investigate" the matter.

226.    Upon information and belief, neither the NYPD nor DANY have made any public statements regarding the outcome of any such investigation(s).

227.    Defendants Vasquez and Mulvey both remain NYPD Officers assigned to SRG 1.

228.    Upon information and belief, as of the time Ms. Winsor's counsel ordered the trial transcript in connection with preparing for potential civil litigation, neither the NYPD nor DANY had even ordered a copy of the trial transcript.

229.    Upon information and belief, there were no consequences for Defendants Vasquez or Mulvey in connection with their provision of false evidence against Ms. Winsor.

230.    Upon information and belief, there were no meaningful consequences for Defendants Vasquez or Mulvey in connection with their provision of false evidence against Ms. Winsor.

## FIRST CLAIM FOR RELIEF

**FOR VIOLATIONS OF PLAINTIFF'S FAIR TRIAL RIGHTS UNDER THE FIFTH, SIXTH, AND/OR FOURTEENTH AMENDMENTS TO THE UNITED STATES**

**CONSTITUTION, THROUGH 42 U.S.C. § 1983 - AGAINST DEFENDANTS VASQUEZ AND MULVEY**

231.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

232.     Defendants Vasquez and Mulvey fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which Plaintiff suffered deprivations of liberty.

233.     That fabricated evidence included, but was not limited to, their purported observations of and interactions with Ms. Winsor and Ms. Dunnington leading up to their arrests memorialized in their memo book entries, the accusatory instruments they swore out, and their trial testimony; as well as their provision of false accounts of their observations and conduct to NYPD Legal Bureau prosecutors verbally.

234.     After Ms. Winsor's arraignment, the ongoing criminal cases that were brought and pressed forward based on Defendants Vasquez's and Mulvey's fabricated evidence imposed other restrictions were imposed on his abilities to travel.

235.     For example, at Ms. Winsor's arraignment, she was ROR'd, and as such was required to remain at all times subject to and amenable to the processes, orders, and mandates of the New York City Criminal Court.

236.     Ms. Winsor was required to appear before the New York City Criminal Court approximately at least 11 times before the case was resolved with a "NOT GUILTY" verdict.

237.     As a result of the foregoing, Plaintiff was deprived of Plaintiff's liberty, experienced stress, emotional injury, and humiliation, was forced to pay costs and expenses, and was otherwise damaged and injured.

**<u>SECOND CLAIM FOR RELIEF</u>**

**FOR VIOLATIONS OF PLAINTIFF'S RIGHTS TO BE FREE FROM MALICIOUS PROSECUTION UNDER THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, THROUGH 42 U.S.C. § 1983 - AGAINST DEFENDANTS VASQUEZ AND MULVEY**

238.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

239.    Defendants Vasquez and Mulvey misrepresented and falsified evidence to the NYPD Legal Bureau attorney prosecutor and to the New York City Criminal Court.

240.    Defendants Vasquez and Mulvey did not make a complete and full statement of facts to the NYPD Legal Bureau attorney prosecutor or to the Court.

241.    Defendant Vasquez and Mulvey withheld exculpatory evidence from the NYPD Legal Bureau attorney prosecutor and the Court.

242.    Defendants Vasquez and Mulvey were directly and actively involved in the initiation or prosecution of criminal proceedings against Plaintiff, including by supplying and creating false information to be included in NYPD paperwork that was included in NYPD paperwork, providing falsely sworn information in accusatory instruments, providing false information to the NYPD Legal Bureau attorney prosecutor and to the Court.

243.    Defendants Vasquez and Mulvey lacked probable cause to initiate and continue criminal proceedings against Plaintiff.

244.    Defendants Vasquez and Mulvey acted with malice in initiating criminal proceedings against Plaintiff.

245.    Defendants Vasquez and Mulvey were directly and actively involved in the continuation of criminal proceedings against Plaintiff.

246.    Defendants Vasquez and Mulvey lacked probable cause to continue criminal proceedings against Plaintiff.

247.     Defendants Vasquez and Mulvey acted with malice in continuing criminal proceedings against Plaintiffs.

248.     Defendants Vasquez and Mulvey misrepresented and withheld evidence throughout all phases of the criminal proceedings.

249.     Notwithstanding Defendants' misconduct, the criminal proceedings against Plaintiff were favorably terminated on the merits.

250.     As a result of the foregoing, Plaintiff was deprived of Plaintiff's liberty, experienced stress, emotional injury, and humiliation, was forced to pay costs and expenses, and was otherwise damaged and injured.

### THIRD CLAIM FOR RELIEF

### POLICY, PRACTICE, AND/OR CUSTOM CLAIMS - AGAINST DEFENDANT CITY OF NEW YORK

251.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

252.     Ms. Winsor would likely have accepted an ACD without allocution to resolve the criminal cases.

253.     However, because of the NYPD policies complained of herein, that was not an option for Ms. Winsor.

254.     Ms. Winsor did not want to admit under oath that she had committed the underlying substantive offenses that Defendants Vasquez and Mulvey had accused her of because she had not in fact engaged in that conduct.

255.     As a result of the NYPD policymakers' decisions to assign NYPD Legal Bureau prosecutors to Ms. Winsor's case (and other, similar Black Lives Matter cases), and to deny people such as Ms. Winsor who were arrested at protests the ACD-without-allocution offers they

would otherwise have received in New York City Criminal Court in cases that were not prosecuted by NYPD Legal Bureau attorneys, Ms. Winsor was prosecuted and was required to make more than 11 appearances over the course of around a year before she was acquitted after trial.

256.    Additionally, during and after Ms. Winsor's trial at the latest, policymakers for Defendant City, including the NYPD Deputy Commissioner of Legal Matters, knew, or should have known, that Defendants Vasquez and Mulvey, had given false evidence in connection with Ms. Winsor's prosecution.

257.    Yet despite that knowledge, and public promises to conduct an investigation, the NYPD has made no public comment about any such investigation; and appears either not to have conducted such an investigation, or to have conducted an investigation that did not result in any meaningful consequences.

258.    Accordingly, Defendant City failed to train and/or supervise Defendants Vasquez and Mulvey in connection with the requirements to testify truthfully under oath.

259.    As a result of the foregoing, Plaintiff was deprived of Plaintiff's liberty, experienced stress, emotional injury, and humiliation, was forced to pay costs and expenses, and was otherwise damaged and injured.

## FOURTH CLAIM FOR RELIEF

**FOR A DECLARATORY JUDGMENT THAT DEFENDANT CITY OF NEW YORK VIOLATED PLAINTIFF'S RIGHTS UNDER NEW YORK CRIMINAL PROCEDURE LAW §§ 160.50 AND/OR 160.55**

260.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

261.    Just before the beginning of Plaintiff's September 26-27, 2017 bench trial, the NYPD Legal Bureau prosecutor made an application to the Court to explore alleged prior bad acts related to purported prior arrests that had resulted in sealing under CPL §§ 160.50 and 160.55.

262.    Specifically, the NYPD Legal Bureau prosecutor stated: "The *Sandoval* [application] would be based on several sealed records….they're all sealed."

263.    Under CPL §§ 160.50 and 160.55, all official records related to a sealed criminal proceeding are required to be *unavailable* to an agency such as the NYPD, unless the NYPD obtains an unsealing order based on a showing to the Court "that justice requires that such records be made available." *See* CPL §§ 160.50 and 160.55; *see generally, R.C. v City of NY*, ___Misc 3d___, 2019 NY Slip Op 29134 (NY Co. Sup. Ct. 2019) (Tisch, J.)

264.    The NYPD Legal Bureau prosecutor stated on the record that no judge had signed an unsealing order allowing the NYPD access to such sealed records.

265.    Plaintiff seeks a declaratory judgment that the NYPD's accessing of Plaintiff's sealed criminal records violated her rights under CPL §§ 160.50 and/or 160.55.

## **JURY DEMAND**

266.    Plaintiff demands a trial by jury in this action of all issues pursuant to Fed. R. Civ. P. 38(b).

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for the following relief:

A.    Compensatory damages against the Defendants jointly and severally;

B.    Punitive damages against the individual Defendants;

C.    Attorney's fees and costs pursuant to 42 USC §1988;

D.    A declaratory judgment that Defendants violated Ms. Winsor's rights under CPL

§§ 160.50 and/or 160.55; and

E.      Such other and further relief as the Court deems just and proper.


DATED:      Brooklyn, New York
                July 11, 2019

                                      Respectfully submitted,

                                          /S/
                                _____
                                  Gideon Orion Oliver
                                  *Attorney for Plaintiff*
                                  1825 Foster Avenue, Suite 1K
                                  Brooklyn, NY  11230
                                  718-783-3682